Is it Mr. Weiner? Only if you rule against me, Your Honor, otherwise it's Weiner. You can proceed. Good morning, may it please the Court. Lewis Weiner for the appellant to G4S Technologies with me is my colleague, Brendan Ballard. Your Honor, there are three issues we'd like to address. One is what the proper standard is for determining third-party beneficiary status. The second is what factors support G4S's argument that it was in fact or is in fact a third-party beneficiary of the contracted issue. And the corresponding issue is whether those issues either establish G4S's status as a third-party beneficiary or whether they create material issues of fact and dispute that should have precluded the Court's entry of summary judgment. And finally, we want to discuss the procedural aspects of the case, and specifically the Court's limitation on jurisdictional discovery and how that impacted the case. If I may, the proper legal standard to be applied to determine whether a party is a third-party beneficiary to a contract is for a third-party beneficiary status to be conferred on a party, the contract must reflect the express or implied intention of the contracting party to benefit the third party. Such intent is determined by looking at the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract, and we will submit there is nothing specific in the contracts at issue here that would give that guidance, the requisite intent on the part of the government can be inferred from the actions of the contracting officer and circumstances providing the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party. Can I ask this question? This business about intent to benefit the third party, at least I find not all that helpful in distinguishing those situations in which subcontractors are entitled to enforce the contract and those in which they're not, because in probably most contracts, the government or whoever is entering into a contract with a prime contractor to create something, the government knows there are going to be subcontractors, the government is entering into this because it wants the contract to be performed, it therefore wants the people who are doing the work to benefit the ultimate beneficiaries here, presumably rural residents, to get the benefit. It is perhaps indirect, but it is a benefit. How does this relate to the Supreme Court's recent description of the restatement standard? A non-party becomes legally entitled to a benefit promised in a contract only if the contracting party is so intent. I understand that better, an intent to bind itself to this third party. Your Honor, I think that in this case we have to look at the totality of the facts. I equate this to an impressionist painting. We're standing right up against it, all we're seeing is dots. Monet was a great painter, not because of the dots, but because when you step back, you see the picture. But what are we looking for? The question is, what are we looking for when we step back and look at the picture? Are we looking for something like an intent to benefit directly, whatever that may mean, or what seems, at least to my mind, more understandable, an intent on the part of the government to bind itself to this subcontractor. I think there are three things that we can look at in this context. Not look at, what are we looking for? What we are looking for is the government saying to the subcontractor, you're going to get paid here. We are going to make sure that you get paid, and I think there are three things that do it in this case. First, it was a pledged deposit account. Even if the Court of Federal Claims articulated the correct standard, which we don't think it did, we think the standard that it articulated was too narrow because it focused only on payment obligations. We think the existence of the pledged deposit account both establishes that – well, first, that it establishes the government's intent to benefit the subcontractors here because of the mechanisms inherent in the pledged deposit account, which I'll speak to. But we think also it creates a minimum, a material issue of fact as to the issue of the government's intent. Let me be more specific. The pledged deposit account was set up specifically to be the repository of funds paid by the RUS, the Rural Utility Service, for basically invoices that were submitted by subcontractors. The only money that could go into the pledged deposit account were loan proceeds, and loan proceeds were then limited to the loan could only be used for construction and could not be used for operating expenses. So if it could only be used for construction and the subcontractors were the only ones that were performing the construction, the only money that could be used from the loan proceeds that went into the pledged deposit account were monies to pay subcontractors. The government retained its ability to audit that account. Why? And there's testimony in the record that says from the government's auditor itself saying, we audited that account to make sure that this prime contractor paid the money in accordance with what he told us he was paying the money for. Is that kind of arrangement common? Because as you describe it, it feels to me at least, and I'm not knowledgeable about this, like the kind of thing that government might well want to do with a vast range of contracts. You're dealing with somebody and you're providing monies for A but not for B. You know that that prime contractor has to do A and B. Let's keep the accounts separate. I'm worried about the overreach of reliance on that as a distinguishing fact for what has to be an exceptional circumstance of subcontractors getting third-party beneficiaries. Understood. And again, from the precedential standpoint, I appreciate the concern. But what's unique about the pledged deposit account in this case is when you look at the other cases that the Court of Federal Claims relied on in saying that there was an absence in this case of the kind of payment arrangement that existed in those other cases. It's because in none of those other cases did you have this kind of arrangement. Did you have a pledged deposit account? So the government didn't need to set up something else differently. It already had a payment mechanism that in its mind it could use to ensure that subcontractors were in fact being paid. We can look at other factors. For example, the exhibits B-1 and B-2 that factored into the loan amendment. What was the intent of B-1 and B-2? The intent of B-1 and B-2, which was prepared by Ken Cuccino, the director of the RUS program, was to ensure that these subcontractors got paid. B-1 and B-2 had Mr. Cuccino's fingerprints all over it. The record is clear that Mr. Cuccino made the final decision as to which invoices were going to be approved, which were not going to be approved, which were going to be on Schedule B-1 for immediate payment, which were going to be on Schedule B-2 for subsequent payment. That was a condition of OEP making a $40 million capital investment in the project. Again, the intent of this was to make sure that subcontractors were benefited, to make sure that subcontractors were paid. How did that money get paid? Through the pledge deposit account, which is tantamount to the type of payment arrangement that the Court of Federal Claims pointed to that existed in the other types of cases. Again, the government didn't need to set up a joint payment account. It already had a vehicle, a payment mechanism in place into which it could deposit money. The money would be paid to the subcontractors. The government maintained audit authority over that and, in fact, did audit the account and had the ability to ensure that if G4S submitted an invoice and it paid it, that Open Range, in fact, paid that money back to G4S. That was the intent of the payment mechanism, which is tantamount to the type of payment mechanism that the Court of Federal Claims pointed to existed in other cases. A third thing, look at the Velocitel issue. Velocitel was another subcontractor. Velocitel, like G4S, was concerned that it was not being paid. It didn't go to Open Range to bring its complaint. It sued Open Range and went to RUS. When the case was settled, what did Velocitel do? It didn't go back to Open Range. It went to RUS. It went to Ken Cuccino. What did Mr. Cuccino say about the Velocitel settlement? He said, we couldn't pay the settlement directly because we weren't a party. So what did we do? We got invoices submitted after the fact by Velocitel, and we paid invoices equal to the amount of settlement. So effectively, RUS paid the settlement. There was an instance where the vendors knew, you don't go to Open Range if you have a problem. You go to RUS. RUS created an artifice to make sure that subcontractors were paid. At a minimum, we think that those three factors, we think that it established, we satisfied the high burden. But even if we don't, we think that viewed in the light most favorable to G4S, as the trial court should have and this court should do in reviewing this matter de novo, that those factors should be viewed in the light most favorable to G4S, and at a minimum, there was a material issue of fact and dispute as to what the true intent was of G4S's interactions with the subcontractors. We can't ignore what happened in Velocitel. Again, Mr. Kuchno's own testimony was the invoices that they paid were submitted after the settlement was reached in order to allow them to pay an amount equal to the settlement to resolve the claim. Velocitel went directly to the government, not to the prime contractor. We look at Exhibits B1 and B2. It was the government's own hand that said, these invoices are going to be paid, and it came up in the context of the vendors saying, we're concerned, we're going to walk off this job unless we get some assurance that we are going to be paid. And that assurance came in the form of the government's own stroke of a pen through Mr. Kuchno executing B1 and B2, saying we are going to pay these invoices. What happened? Was G4S part of those discussions? No. But there is evidence in the record that Chris Edwards from Open Range went back to G4S and said, don't worry, the government is going to pay you. G4S knew about what the government was doing. They got the assurance they were looking for from the government that they were going to be paid. And finally, we returned back to the pledged deposit account, which was the vehicle. Again, I submit no different than the types of vehicles that were established in the other cases cited by the Court of Federal Claims to ensure that subcontractors would be paid. Your Honor, the final issue that we'd like to raise is this issue of jurisdictional discovery and how it affected the outcome of this case. We were reminded numerous times throughout the discovery phase of this case by the Court of Federal Claims that we were in jurisdictional discovery, limited jurisdictional discovery. The Court said, again, at the earliest status conference between the parties, the Court said, we're not going to escape the need to do some jurisdictional discovery and the discovery will be limited to jurisdiction. The Court advised the government counsel, if you feel G4S is being abusive in the process, you can come back to me for a protective order. Right now, I'm simply going to limit it to jurisdictional discovery. The Court's order reflected we were in jurisdictional discovery. Discovery disputes arose. I was admonished during one of those disputes quite, quote, I can't forget the fact, Mr. Wiener, that we really are in jurisdictional discovery. When the government filed, when we filed the opposition to the government's motion to stay discovery, which was... Can you get to the punchline? What's the point you're making? The Court made the point that we didn't have the, we don't believe that we have the opportunity to take full merits discovery in this case. The case was decided, was it not, on the jurisdictional? No, Your Honor. The Court concluded that we did, in fact, satisfy the jurisdictional threshold by stating a valid claim for third-party beneficiary. The Court then went on to grant motion for summary judgment in the government's favor. There's something of a fine line between, I guess the substantive question is, were you denied any discovery on the question of whether you as a subcontractor could bring this contract claim? Yes. We were denied discovery. Which is relevant both to the jurisdictional question of whether you're one of the people entitled, you know, under privity or something, but I guess I'm trying to understand what daylight is there between the jurisdictional and the merits. On the substantive focus, what was the relation between you and the ultimate federal government that might have given you a right to say they owe you something directly? Your Honor, there is no question that the merits and the jurisdictional issues are intertwined. And the Court on the jurisdictional issue found that we had satisfied the jurisdictional element and had stated a valid claim for third-party beneficiary. The Court then went on to rule on the merits. I'll give you an example of some discovery. We wanted to take the deposition of Scott Steiner. Mr. Steiner submitted an affidavit in support of the government's motion for summary judgment. I was admonished and told I could not take that because we were only in jurisdictional discovery and we had reached the maximum number of depositions that we could take under jurisdictional discovery. The Court said, if you feel you need more discovery, come back. In our opposition to the government's motion for summary judgment, we said the Court limited us to jurisdictional discovery. We cited Rule 56D2. The Court in its order said you failed to submit a declaration. We were saying to the Court in our opposition to the motion for summary judgment, you limited us specifically to jurisdictional discovery, not once, not twice, but three times. You admonished us. You are only in jurisdictional discovery. It's limited. When we wanted to take other discovery, we couldn't. The Court said, well, come back. We filed a brief that said we have satisfied the jurisdictional requirements of this Court, to which the Court of Federal Claims agreed. The Court said we have jurisdiction over this case because you have satisfied that threshold. Just correct me if I'm wrong about the following characterization. The jurisdiction question here is the kind of junior varsity version of the merits question. Do you have enough to make a Bell versus Hood substantial kind of claim on exactly the same substantive issue that I'm now going to decide substantively? In order for there to be a difference in discovery, the Court of Federal Claims had to have somehow limited you to only so much discovery on the relation between you and the government, at least one level above, as would be necessary for you to clear the Bell versus Hood threshold and then said, stop. You're there. You don't get any more to actually persuade me that you're right about the merits of the claim. Is that what happened here? There's two different standards, Your Honor. You've got the Rule 12 standard, which we satisfied. Then there's the Rule 56 standard. Rule 56, we were operating under a limitation on discovery under the Rule 12 standard. We ultimately prevailed in defeating the government's motion to dismiss on Rule 12. The Court then considered the merits under Rule 56. Viewed in the light most favorable to the nonmoving party, G4S, we think that there was ample evidence for the court to conclude that there were material issues of fact and dispute as it relates to the intent for the reasons I discussed earlier. If the court was going to go ahead and rule on those issues and specifically consider Mr. Steiner's deposition, we said to the court, we should have the opportunity to take his deposition to conduct full merits discovery. In fact, when the government first submitted its motion for summary judgment, we asked the court to convert the proceedings to a Rule 56 proceeding, and the court denied that request. Keeping the inquiry on the Rule 12 standard, does the court have jurisdiction? We satisfied that burden. For purposes of the court's limitations, that's where the inquiry should have ended. We then should have gone back and been able to submit cross motions for summary judgment. That didn't happen here. The government jumped the gun, submitted its motion for summary judgment, and tried to get jurisdictional discovery stayed. The court said, no, we're not doing that. We are going to continue with jurisdictional discovery, and we're not converting these proceedings to a Rule 56 proceeding. Okay. You've exceeded your rebuttal time and more. We'll restore three minutes for rebuttal. Thank you, Your Honor. May I please report? The judgment of the Court of Federal Claims should be affirmed because the plaintiff, G4S, provided no evidence to raise any kind of issue of material fact regarding whether the Ross had some kind of an intent when it made a loan agreement. What about this question of the pledged deposit accounts that your friend raised? The pledged deposit account was a requirement of the Ross regulations so that Ross could be assured that when it advanced loan funds to Open Range, it was aware of why Open Range required those loan funds at that time. Open Range was required in order to qualify for an advance to provide invoices and a financial requirement statement outlining what the advances were going to be used for so that Ross could keep track of progress on the construction project, which was for a broadband system, and protect the government's money. Is this a typical process? It's a typical process. Anytime or oftentimes when there are progress payments as part of a contract that the government enters into with a prime contractor, which it knows is going to hire a substitute person to the work, oftentimes in order to provide a progress payment, the government requires the prime to submit invoices for other indications that work was done that would justify providing the progress payment. This is no different than that. What about the separate account business? Is that common? Well, it is common in the sense that the money was, until Ross had a security interest in the system and it wanted a security interest in the loan proceeds until the proceeds were converted into aspects of the system. So the pledged deposit account served that purpose. My question is, is that kind of account used frequently, rarely, only in circumstances you can describe? I was worried about, in discussing it with Mr. Williams, the potential breadth of a ruling that said, when you have that kind of account, the subs get enforcement rights. Which is a very valid concern. It's valid only to the extent that this is common. If it's a one-off arrangement, it's really no concern at all. It is common, and if you look at the Court of Federal Claims decision in the Albert case, which is cited in our brief, you'll see that the issue of a pledged deposit account was raised in Albert. And the judge in that case said that it was a convenience for the government to make sure the project got built. It wasn't to benefit the subs, who eventually received money from the pledged deposit account. And the Court of Claims rejected third-party beneficiary status that was argued based in part on a pledged deposit account. Besides the Albert case, are you aware of any book, regulation, whatever, that if I went to look for, I might find that said, this is a normal kind of way in which the government disperses money that it wants to keep track of? Well, at this point in time, I can only refer you to Albert. But I could tell you about a distinction. What your court has said, not once, not twice, and not just last year or the year before, but for the last, at least since the 70s, the plaintiff in this case is like one of these figures. You keep hitting him and he bounces back. The plaintiff refuses to acknowledge what the law... Sometimes that has been said about the government. Well, I suppose, but I'm saying it about the government. The plaintiff refuses to acknowledge what the cases say in this area. The lawyer just now in his argument looked at facts, all of which are refutable and wrong, but I don't think it's useful particularly to talk about that before one talks about the legal framework. What the plaintiff is saying here is that because it was a government program, it was government money, but the government managed it. The government required the prime to use government contracts when the prime entered into contracts with the subs. Now, according to the plaintiff, that indicates the government intended to provide a direct benefit to the subs. No, they're saying one thing in addition, which really differs often enough from the standard subcontractor, and that is that when the vendors weren't being paid, they went directly to the government and received an absolute clear assurance, sometimes in writing, sometimes not. You will be paid. That is a false statement by counsel. There's no evidence in the record to support that. There is some evidence. The question is what you put on the assurance, no say on the contract, stop worrying. The president of the sub that's the plaintiff testified that he never spoke to the government about anything. No, but I thought at least in the record, I didn't think it was disputed that the government offered to talk to the vendors to assure them that the project was still going forward and that that never happened, but at least the government put out that offer. So let's assume the government had talked to the vendors. One, is that correct, or is the government saying they never made the offer? Internally, there was discussion about having a conference call with subcontractors to explain that despite the fact that advancing loan funds was suspended because of prime loss spectrum, because the prime received new spectrum on a temporary basis, the government would lift the suspension. There was talk about the government stating that to subs directly if the subs wanted to convene a conference call. But it never happened. But what if it had? Would that be sufficient to establish their position? In my opinion, absolutely not. If you look at your case law in this area, what the case law seems to suggest is that they're standing, and it goes back to the Supreme Court statement that you brought up to begin with, can you decipher from the record an intention by the government to be bound by making a promise to a non-party to the contract? The fact that a third-level official at Russ, who is not authorized to make a contract anyway, might have had the idea of holding a conference call, which was then overruled by one of the superiors, whether that could indicate an intention to be bound by a promise to a non-party, I think speaks for itself that it isn't evidence. It's evidence of wanting to be helpful. It's evidence of wanting to get the subs in line so the government's objective of getting a broadband system built was satisfied. But if you think about it, a statement that we'll talk to the subs to calm them down, is that an intention to make a promise to do something for those subs? I don't think so. So what is the test here? Is it the level of assurances? At what stage does something go from one end to the other? If the government had provided assurances, look guys, don't worry, this is all going to work out, you're going to get paid, is that sufficient? I'll tell you. If, well, you have made a bright line test in your cases, the D&H distributors case and the JGB Enterprises case, which is... On the facts of that case. Excuse me? On the facts of that case, which are different... On the facts of that case, which are different. Of course, there was a bright line on the facts on which you decided. Well... What we really need to understand here, and also to understand, whether in fact, since the work was done, since there were at least indirect encouragement, no, don't withdraw, you'll get paid, and no one's ever said that the work hasn't been done by at least the vendors, the one who settled with the government, and now this vendor, that where, in fact, is the balance, as far as the relationship with a subcontractor? We appreciate that there are a lot of rules that have grown up as to the place of subcontractors, but when the prime contractor declares bankruptcy, doesn't pay the vendor, who has nonetheless provided the substance directly to the government, not to the prime, where, in fact, should our government set the balance? I don't accept all the premises of what you just said, but even accepting them, I think it's the same test that has been announced that the Supreme Court laid down. Can you decipher in what the government does an intention to provide a direct benefit to the non-party? You're troubled, maybe, that the sub wasn't paid. When the sub enters into a contract with a prime, that's the sub's risk that the prime might go bankrupt. The government doesn't insure that, which is exactly what, this sub sought relief in the bankruptcy court. The bankruptcy court said, no relief, it's your risk, tough luck. I mean, they were paid most of what they did. They say they're short $10 million, which we don't know for sure, but why should the government be the indemnitor of the prime paying the sub when the government never agreed to do that? When they got thrown out of the bankruptcy court, then they came here for a second bite of the apple, knowing the case law. They were thrown out on the theory that they don't have a claim against the bankrupt prime. Their claim is against the United States. That wasn't the reason it was thrown out. The reason it was thrown out was because there was no trust fund set aside for them, which is what their claim was, so they had to stand in line with the other creditors. They wanted to move ahead of the other creditors by claiming there was a dedicated fund of money for them. The bankruptcy court said, there's no dedicated fund of money for you. So when you say thrown out, you mean after the priority creditors got money, there was nothing left and everybody was thrown out? Yeah, everybody was thrown out. There was some money divvied up in a settlement, which this plaintiff refused to become part of. They wanted their whole thing. And then the estate was gone? The estate was settled and there isn't anything left. Okay, can I ask you, there was reference not to, in addition to any offers of communication with this sub, there was reference to the submission of invoices by, is it one or more others, Velocitel? Yeah, he's talking about a different sub that had a dispute with the prime that went to court. So what happened there and why does whatever happened there not constitute some evidence that the government was binding itself to some subs and maybe, therefore, inferentially to this sub? That incident is not fully developed in the record, so it's hard to know exactly what happened. Well, you know more about it than I do. Yeah, what I can say is my understanding of what happened was, is that Alvarian, which was an equipment supplier, had a dispute with Open Range. Alvarian is a sub and Open Range is the prime. And Alvarian also did some work that resulted in a mechanics lien. And Open Range couldn't pay Alvarian before it got an advance from Russ. But Russ said, we can't give an advance until the lien is lifted because then there's priority over our security. In other words, Russ wanted to ensure that it had first priority on anything that was constructed. But if this lien from the mechanics was there, it wouldn't have had. So a dispute arose about that and Alvarian took Open Range to court and Open Range came to Russ and said, can you adjust your records requirements a little bit so that you can make us the advance with a slightly different record that doesn't include a lifting of the lien because it will be lifted once you provide the money and then we pay Alvarian. Russ agreed to do that. I'm not aware Russ had any direct – well, that's not true. Mr. Kuchno said there was one short conversation with someone from Alvarian about – I think Mr. Weiner said something about a sub presenting invoices directly to Russ and getting paid. There was – all the invoices that subs submitted were submitted to Open Range. No invoices were submitted to Russ. The invoice – Open Range then took the invoices, combined them with what we call a financial requirement statement and that was all submitted to Russ. And by virtue of that, Russ would then advance money to the pledge deposit account and Open Range could then use that money to pay the subs. But there was never any direct interaction between any sub and Russ. It was all through Open Range. This is a $270 million loan. Open Range was a startup company that had $100 million of backing by J.P. Morgan. It was a substantial company in Denver. All the interaction was – and it was hired by or made a borrower of Russ because Russ wanted to develop internet in rural areas. So Russ worked with Open Range to do that. Open Range selected the subs. Open Range paid the subs. All communications that relate to the system were from Open Range to Russ. None of the subs were involved with Russ. Did I hear you say that Open Range paid the subs? Yes. Until that this vendor was not paid or not paid the full amount? Until Open Range became bankrupt because some of the subs didn't do the work correctly and Open Range didn't do some of the work correctly. I didn't see that in the record. It's in the record. That the work of this vendor was inadequate? OEP, the J.P. Morgan executive, said that the system wasn't competitive with other systems. So they missed – We have here a particular vendor, and I didn't see that there was any objection to the quality of the performance, except that the invoices weren't paid the final invoice. It's in the statement of the OEP guys in the brief, in the government's brief, where he says that – I'm not talking about an attorney's statement in a brief. No, not an attorney's statement. What does the record say? I quoted the deposition of the investor in the brief, and the statement of the investor was that – The investor? The investor, J.P. Morgan. The J.P. Morgan executive, who was financing Open Range, was deposed by the plaintiff, and he made statements about the fact that – J.P. Morgan is advising on the technical competence of the production? No, J.P. Morgan was an investor. J.P. Morgan was an investor. Yes. So they are the authority on the technical competence? I would think so. They want to protect their investment. Constructed by – I would think so. I mean, who more would want to see that the jobs were held by the investor? Well, these venture capitalists know about broadband. Was he qualified as an expert in all of this? No, not that I'm aware of. He was a fact witness. He was an investor. My impression is that there is no issue here of the quality of the performance. The question is whether, in fact, the vendors, instead of being at the end of the creditor line for the bankrupt prime, have, because of the particular facts of this case, because of the work that was done and accepted, and apparently is there entitled to some sort of equitable or whatever you want to call it payment for the work that was done, not work that was not done, not work that was rejected, but work that's there and completed. There were five or six adversaries proceedings started by various parties in the bankruptcy court complaining about the quality of the work. So none of those were resolved. None of those were resolved. It was all settled. That's my understanding, that it wasn't resolved. It was all settled. Shouldn't a vendor be entitled to resolution by our government? It isn't as if the government is bankrupt. The government received the work. The primes disappeared for whatever reason. This plaintiff is a subsidiary of a British international company that is number one in the world in providing security services. What does that have to do with it? Well, they took the risk that OpenRange would be a viable company, and they did the work, and it turned out to work. Every business takes the risk that they're not paid. That's right, and if you have to take pennies on the dollars because there's a bankruptcy and it's not done viably, you go on to the next project and you get better. If you're paid, you sue the person who receives the benefit of your work? Not if you don't have to. At least pay me what it's worth? The government paid the contractor, right? Yes. Right. OpenRange. The government paid whatever it was. Whatever it was asked to pay, it paid. And then OpenRange became bankrupt, and there were some arrears to some subs. In bankruptcy, the government was not going to give them more money out of federal tax dollars, so the subs that weren't paid yet had to make their way to bankruptcy court, and they made a settlement in bankruptcy court, but this plaintiff refused because they wanted the whole thing. They refused to take a portion like the others did. The bankruptcy court said tough luck, so they came to the Court of Federal Claims. The Court of Federal Claims said tough luck too,  Thank you, Your Honor. Thank you. I'll be brief. Just tell us why it's not tough luck. Tell us why your client is different. I'd like the opportunity to be able to tell the Court of Federal Claims why it's not tough luck, and I believe that there are material issues of fact and dispute that should allow us to make that case before the Court of Federal Claims. First, there has never been an allegation that I am aware of that there was any issue with the quality of G4S's work. Our understanding is that there was over $10 million, and our claim is there was over $10 million worth of work that was done that was never invoiced by OpenRange to RUS, and that money was never paid. There is no question that RUS performed that work for the government's benefit and helped complete this rural broadband network. The government still enjoys the benefit of G4S's work. They were formerly known as a DESTA. They were basically put out of business because of this. I can't tell you there's anything in the record to that effect. But let me get back to the issue that the Court raised regarding the communications from the government intended to benefit the subcontractors. I point you to the record to page A, 1416, 1419, and 1420. If I could start with 1419 and 1420. September 23rd e-mails from OpenRange to RUS. Now the government's counsel made a comment, we can't rely on some representations by a third-level bureaucrat. He didn't say bureaucrat in my words. He said third-level. I know he said third-level. These are communications that went from Lindsay Daschle, who was Special Assistant, to the Secretary, to among others, Al Motter. Mr. Motter was a lobbyist. These were not just internal communications. What does it say at the bottom of 1419, the bottom e-mail? You, Q, is Mr. Saeed at OpenRange. You can expect the letter and simultaneous release of funds by the end of the day. He goes on to say, the letter will serve as the press release, and we will continue to talk to anyone, vendors, press, et cetera, who need help to calm fears and rebuild credibility. Can I ask, I'm worried about this, so tell me why I shouldn't be worried. The government, in an ordinary, long, expensive project, it's going to go on for a while. It put out that contract because it's very interested in the completion of the work for whatever public benefit it would provide. It sounds to me like you're suggesting that the government starts incurring additional legal obligations when it does what would seem the quite responsible thing of talking to the people involved to figure out what the heck is going on and see if it can get it working. Wouldn't that be a terrible rule? It would be an unfortunate precedent and not one that we are advocating for. So how does the, even if there had been communication, how would it somehow legitimately help support a conclusion of an intent to bind itself that it talked to a lot of the people who were responsible for getting the service ultimately up and running? Your Honor, I will point you to pages 1416 and 1417 that involve not communications of third-level people, but the administrator himself of the RUS. My question is, do we believe it's the administrator? But it gets to the point of, you asked the question earlier of government counsel, aren't these pledged deposit accounts commonplace? There is no evidence in the record that they are or they are not. It is an open issue. There is a material issue of fact and dispute as to whether these are commonplace. The one case, the Allberg case that Mr. Levitt pointed to, didn't involve a, there was a question of whether the third party could get the government involved in a contract. It's the opposite of what we have here. He pointed to one case. There is no evidence in the record as to the uniqueness of this. We believe this is a very unique circumstance. This pledged deposit account, the way it was set up, satisfies even the narrow requirement and the narrow standard that the Court of Federal Claims articulated. They didn't need to do anything else because they already had the vehicle in place. In those cases, this type of arrangement did not exist. Chief O'Rourke should have the opportunity to have its day in court to prove that this arrangement was unique, that it's not going to create an unfortunate precedent, that the facts of this case, when viewed, that mosaic viewed from several feet away, creates a picture that says the unique facts of this case, viewed through the prism of the proper standard, create third party beneficiary status in G4S. We think that, again, there are issues, material issues of fact and dispute regarding the nature of the pledged deposit account, regarding the communication... Can you address very specifically what I think I heard directly contradictory things said? I thought I heard you say in your opening argument that some sub submitted an invoice to the federal government and got paid directly, and the government lawyer said, no, absolutely not. I can point you to page A727. In that case, and A727, the government's counsel is correct. Mr. Cuccino testified that Velocitell went to RUS and said, and it's in the context of the deposition, it's on pages 260 and 261. Mr. Cuccino lays out how that process worked, and what he said was they didn't fund the settlement directly because they were not able to, so they instructed Velocitell, submit your invoices to Open Range, Open Range will give them to us, we will pay them in an amount basically equal to the settlement. They went through the process, but the result was when Velocitell had a problem and had a beef with the government, basically because they weren't being paid no different than G4S, what did they do? They went to RUS, RUS figured out a way to pay them because the invoices that they ultimately paid were submitted after the fact in an amount equal to the amount of settlement that Velocitell was looking for. It was an artifice, but it creates an impression and it reflected the government's intent that other contractors knew about, that if you have a problem, you go to RUS, RUS will give you that assurance, and in this case actually paid the amount, again, through the pledge deposit account, but it was clear what the intent was. Okay, time has expired. I think we have the argument. We thank both counsel and the cases. Thank you very much.